UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>NORTH AMERICAN HEALTH CARE, INC., et al.,<br><br>    Defendants. | Case No. 14-cv-02401-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 55 |

This qui tam action alleges violations of the Federal, Washington, and California False Claims Acts, violation of federal law governing patient referrals (the "Stark Law"), and retaliation and wrongful discharge claims under Federal and California law. Second Amended Complaint (SAC) ¶¶ 67-116. Plaintiff relator John Orten alleges that in order to artificially increase the number of Medicare beneficiaries at its skilled nursing facilities, defendant North American Health Care, Inc. (NAHC), with the personal knowledge of defendant Sorensen (NAHC's CEO), inflated its Medicare Star Ratings and illegally provided kickbacks to physicians to refer and "regenerate" acute-care patients to NAHC facilities to ensure unwarranted Medicare reimbursement. *Id*. ¶¶ 1-11, 20. Sorensen moves to dismiss the Second Amended Complaint (SAC) for failure to state a claim specifically against him. Dkt. No. 55. Orten has plausibly alleged that Sorensen implemented a referral and regeneration scheme and that false claims were actually submitted. His other claims are not sufficiently alleged. For the reasons discussed below, Sorensen's motion is GRANTED in part and DENIED in part.

## BACKGROUND

Orten's allegations in the SAC are taken as true for purposes of evaluating Sorensen's motion to dismiss. With respect to his assertions regarding Medicare Star Ratings, he describes that Medicare.gov and Nursing Home Compare websites issue a "star rating" to allow consumers

to compare facilities. SAC ¶ 6. The Star Rating is based on health inspections – as determined by surveyors – and quality measures and staffing – as determined by data supplied by the facility. *Id*. He contends that NAHC engaged in a practice of paying doctors to sign letters authored by NAHC employees in an effort to falsely convince surveyors that a facility did not have deficiencies, and that NAHC misreported its staffing levels in order to obtain higher star ratings. *Id*. He also makes general allegations about Sorensen's concern over and role in monitoring NAHC facilities' Star Ratings. *Id*. ¶¶ 12, 37, 45-46.

Orten also asserts that NAHC provided illegal and excessive remuneration to doctors who served on its facilities' boards – disguised as consulting fees, compensation, and sometimes gifts – for referring Medicare qualified patients to NAHC facilities. SAC ¶ 2. He contends that these physicians worked with NAHC facility administrators to "regenerate" Medicare coverage by having patients who had exhausted their 100 day coverage for skilled nursing at the higher Medicare rate needlessly readmitted to acute care hospitals for three days and then sent back to NAHC facilities. *Id*. ¶¶ 3-4. This would allow for an additional 100 days of compensation to NAHC at the higher rate. *Id*. ¶¶ 3, 5. As a result, the government paid NAHC facilities more than it needed to.

The success of these schemes is apparent, according to Orten, because the NAHC facilities far exceeded the statewide average in California for percentage of days paid on Medicare and NAHC's overall percentage of Medicare patients in its facilities far exceeded the national average. SAC ¶¶ 4, 7. He contends that NAHC set goals for Medicare census standards and profitability that could not be reached without the fraudulent conduct. *Id*. ¶ 7. And he asserts that NAHC provided financial bonuses to its own administrators to facilitate both of these schemes. *Id*. ¶ 7.

Had the United States, California, and Washington known about the illegal payments to physicians to direct and regenerate patients to NAHC facilities and the inflation of NAHC facilities' Star Ratings as a result of false physician letters and staffing data, Orten contends that they would not have paid reimbursements to NAHC, would not have given NAHC facilities as high star ratings, and otherwise ended up paying more to NAHC facilities than they otherwise would have. *Id*. ¶¶ 9 - 11. Orten also alleges that he was retaliated against and eventually fired

after he refused to provide bribes and related kickbacks to doctors. SAC ¶¶ 12-13.

Sorensen moves to dismiss, arguing that the SAC is devoid of specific allegations that he submitted false claims, provided kick-backs to physicians, or can be considered Orten's "employer" for purposes of the retaliation and wrongful discharge claims. I heard argument on November 4, 2015.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." Id. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

"Because they involve allegations of fraud, qui tam actions under the FCA must meet not only the requirement of Rule 8, but also the particularity requirements of Rule 9." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011). Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). However, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be plead generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d at 992.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

### I. FEDERAL FALSE CLAIMS ACT

Orten's Federal False Claims Act cause of action expressly relies on both the alleged Star Ratings and illegal referral and regeneration schemes.

#### A. Star Ratings

Sorensen argues that Orten fails to state a claim based on the Star Ratings allegations because: (i) Orten does not identify any fraudulent conduct by Sorensen with respect to the Star Ratings scheme; (ii) the SAC fails to plead a "false claim" that is actionable under the statute in connection with the Star Ratings; and (iii) the Star Ratings allegations do not satisfy the materiality standard of the FAC. Motion at 7-11.

#### 1. Sorensen's Conduct

In his SAC, Orten alleges that "Sorensen and other managing agents of NAHC specifically instructed Relator Orten to bribe doctors" to have them sign letters in an effort to contest any deficiencies found by state surveyors and have Orten deliver those fraudulent physician letters to state inspectors in the appeal process which, eventually, determined or impacted the facilities' Star Ratings. SAC ¶ 12. In September 2010, Sorensen told Orten that a four star rating was unacceptable for his facility, and Orten realized that a five star staffing rating could be achieved – given costs – only through fraudulent staffing reports. *Id*. ¶ 37. Orten also details a February 2012 email from Sorensen where Sorensen directs him to pay whatever price he has to, including "an additional $1,000," in order to get physicians to sign off on letters drafted by Orten disputing deficiencies regulators found at a NAHC facility. *Id*. ¶ 45.

Sorensen complains that Orten does not identify any particular NAHC employee that paid any particular doctor to write a particular letter about any particular facility. Motion at 8. However, Orten pleads facts showing that the Sorensen was generally concerned about and involved in monitoring the Star Ratings of the facilities, including the facilities where Orten worked, and that at least in once instance he expressly encouraged Orten to pay a doctor for a

4

fraudulent letter to address deficiencies found by regulators that would jeopardize that facility's Star Ratings. The general allegations about Sorensen's role at NAHC, combined with the specific instances of Sorensen's direct participation as Orten describes, satisfy Rule 9(b) for purposes of this motion to dismiss. *See Ebeid v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010) ("it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" (quoting *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). Sorensen has sufficient information to be able to defend against the Star Rating allegations. *See, e.g., Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (FCA complaint satisfies 9(b) where the allegations of fraud are specific enough so defendants can "'can defend against the charge and not just deny that they have done anything wrong.'" (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (internal quotation marks omitted)).

### 2. False Claim and Materiality in Connection with Star Ratings

There is, however, a bigger hurdle for Orten's FCA claim based on the Star Ratings fraud. Orten fails to allege a sufficient relationship between the Star Ratings, procured through bribes to physicians and inflated staffing data, and any false claim for payment submitted by NAHC. "The essential elements of an FCA claim are (1) a false statement or fraudulent course of conduct, (2) made with requisite scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d at 992. A false statement is material, when it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

In opposing the motion to dismiss Orten relies not on allegations in his SAC, but on federal regulations requiring surveys of facilities to determine whether those facilities meet Medicare and Medical requirements. Opposition (Dkt. No. 63) at 8 (relying on 42 C.F.R. §§ 488.300, 488.330). Orten argues that the surveys required by the regulations – the results of which "can" cause facilities to be excluded from Medicare payments – are in fact the basis for the Star Ratings and the ability of consumers to compare Medicare facilities. *Id*. Orten argues that a nursing home that manipulates its survey data is manipulating the data the federal government uses as the basis for

its determination of whether a facility can participate in Medicare, as well as the data Medicare patients use to compare facilities.

Orten's first problem is that the Star Ratings fraud alleged in his SAC is not tied to any federal statute or regulation, much less tied to an identified payment or submission of a fraudulent claim. Nor does Orten explain how the inflated Star Ratings (which were allegedly secured under Sorensen's direction) resulted in any payment to NAHC.

Orten's second problem is that his other examples of fraud – fraud in the surveys required under 42 C.F.R. § 488.330 and relied on by the government to ensure facilities meet minimum standards for participation in Medicare programs – is not the fraud Orten alleged in his SAC. Orten's complaint alleges fraud (physician letters resulting from bribes and erroneous staffing reports) that resulted in inflated Star Ratings, not manipulation of surveys required by regulation. Similarly, there are no allegations that the particular false statements alleged in the SAC resulted in the government continuing to approve NAHC facility payments and contracts; only that it resulted in higher Star Ratings than were merited.

However, even if Orten is able to plausibly add allegations regarding the connection between the Star Ratings and survey fraud identified in his Opposition in an amended complaint, he still would not state a FCA claim. Orten argues that he need not "connect the dots" between the survey/Star Ratings fraud and specific payments because the violation of the Medicare statutes requiring facilities to comply with the survey requirements in order to participate in the Medicare program is enough. Oppo. at 8-9. He relies on *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1175 (9th Cir. 2006) (*Hendow*), where the Ninth Circuit concluded that because a university's eligibility for federal funds under Title IV and the Higher Education Act of 1965 was explicitly conditioned on compliance with an "incentive compensation ban," fraud related to that ban could support a FCA claim. *Id*. at 1176-77. However, the *Hendow* Court expressly distinguished the Medicare regime and concluded that statutory obligations – like the ones identified by Orten in his Opposition – which require compliance with peer review and monitoring obligations in order for facilities to prove they are maintaining an adequate level of care, could not form the basis of a FCA claim. *Id*. at 1177 (distinguishing *Mikes v. Straus*, 274 F.3d 687 (2d. Cir.

2001), which held that alleged violation of Medicare participation regulations did not state an FCA claim).

District Courts in the Ninth Circuit have likewise declined to extend the *Hendow* rationale to the Medicare context, absent an allegation that compliance with a regulation is a condition of payment as opposed to a condition of program participation. For example, the District Court in *United States ex rel. Woodruff v. Hawaii Pac. Health*, 2007 U.S. Dist. LEXIS 37059 (D. Haw. May 18, 2007), rejected the argument that alleged fraud in connection with a regulation governing participation in the Medicare program was sufficient to state an FCA claim. Instead, as the court clarified, for "Plaintiffs to state a claim based on the false certification theory, they must allege that Defendants violated a statute, regulation, or other law upon which the government conditions payment of Medicare or Medicaid claims." *Id.* at *25; *see also Sweeney v. ManorCare Health Servs., Inc.*, 2005 U.S. Dist. LEXIS 45216, *13-14 (W.D. Wash. 2005) (dismissing plaintiff's Medicare FCA complaint, "where full regulatory compliance is not a requirement for receipt of federal funding. [Plaintiff] does not allege that the regulatory violations were conditions of payment. The regulation violations [plaintiff] points to are conditions of participation in the Medicare and Medicaid programs. Moreover, there are administrative and other remedies for regulatory violations.")(citations omitted)).

In a similar context, in *United States ex rel. Swan v. Covenant Care, Inc.*, 279 F. Supp. 2d 1212 (E.D. Cal. 2002), the plaintiff attempted to state an FCA claim based on a medical facility's alleged falsification of patient treatment records due to understaffing. The District Court dismissed the claim, recognizing that the failure to comply with regulations did not necessarily mean Medicare payments would not be made to the facility because the agency administering the Medicare program had a number of options to deal with the facility's alleged failure to meet quality of care guidelines, "including civil monetary penalties, temporary government management of the facility, denial of payment, or termination of the right to participate in Medicare programs." *Id.* at 1222 (citing 42 U.S.C. § 1395i-3(h)(2)(B)). The court concluded that "[to] allow FCA suits to proceed where government payment of Medicare claims is not conditioned on perfect regulatory compliance – and where HHS may choose to waive

administrative remedies, or impose a less drastic sanction than full denial of payment – would improperly permit qui tam plaintiffs to supplant the regulatory discretion granted to HHS under the Social Security Act, essentially turning a discretionary denial of payment remedy into a mandatory penalty for failure to meet Medicare requirements." *Id*.

Orten's attempt to base his FCA claim on Sorensen's falsification of survey data meets the same fate. The regulations at issue – 42 C.F.R. §§ 488.300 & 488.330 – do not require compliance with statutory and regulatory requirements as a condition for payment. Instead, they set up a method by which state agencies survey care facilities to determine whether those facilities are compliant or non-compliant with Medicare and Medicaid requirements. Importantly, non-compliance does not necessarily result in termination, but can lead to application "of alternative remedies instead of, or in addition to, termination procedures." 42 C.F.R. § 488.330(b)(2)(ii). The regulations, therefore, do not require "perfect compliance" to participate. The fraud complained of by Orten – the falsification of survey data regarding staffing and physicians fraudulently disputing deficiencies found by state regulators – is not connected to a condition of payment, but at most related to participation in the Medicare and Medicaid programs, depending on the remedy the government decides on to address instances of non-compliance. Orten cannot state an FCA claim based on these allegations.

Despite these deficiencies, Orten will be given leave to amend to allege additional facts and identify particular statutory or regulatory requirements that are true conditions of payment and not simply conditions of participation.

### B. Referral and Regeneration

Orten also bases his FCA claim on allegations that NAHC under Sorensen's direction paid "bribes" or "kickbacks" to physicians to both steer patients to NAHC facilities and to regenerate patients' eligibility for Medicare payments. Orten relies on 42 U.S.C. § 1320a-7(b)(2), which makes it a crime for someone to offer or receive remuneration to refer a patient for a service under federal health care program; and 42 U.S.C. § 1395nn which prohibits certain financial arrangements between physicians and entities to which they make patient referrals.

With respect to Sorensen, Orten alleges that in the August 2009 resignation letter of the

Director of Nursing at the Ramona NAHC facility, Bong Flores complained that he had led "nurses in an effort to bring our residents to the Hospital whenever needed, thereby regenerating their Medicare days for them to benefit from Rehab in our facility. . . ." SAC ¶ 31.  And that in a later email Flores wrote he had attempted to achieve "what Mr. Sorensen have [sic] challenged me to accomplish"; which Orten contends is a reference to regenerating Medicare patients. *Id*.

Orten also relies on a February 2010 email from Sorensen regarding the hiring of Dr. James Neel and a presentation, which he attended, where it was disclosed that Neel would work with NAHC administrators to identify local rehab doctors and that administrators were to compensate those local rehab doctors "extremely well" in order to get Medicare referrals to NAHC facilities.  SAC ¶ 33.  He does not allege that Sorensen made or attended the presentation, ("corporate representatives" did), but asserts that Sorensen's email referencing the "confidential" nature of the presentation shows he was aware of the plan to regenerate with Neel's assistance.  *Id*.; Oppo. at 13.

In a May 2010 videoconference attended by Orten, Orten alleges Sorensen directed administrators to pay doctors who would translate to a "value add" of increased referrals to NAHC facilities.  *Id*. ¶ 34; *see also id*. ¶ 56.   As part of that effort, Sorensen told administrators to bring on doctors who would make referrals to NAHC facilities to their facilities' medical review boards "for whatever costs" and get rid of those who were not making referrals.  *Id*. ¶ 34.  Sorensen concluded the meeting by reiterating that the administrators' goals should be to get doctors on board who would send Medicare patients to their facilities by paying them.  *Id*.

More generally, Orten alleges that Sorensen established a culture of profitability and regularly told administrators, including Orten, to find and reimburse doctors who would refer patients to NAHC facilities, and that the pay for those doctors to be on a NAHC facility board should be "above market" and meant to secure referrals.  *Id*. ¶¶ 35-36.  Orten was also told by "NAHC" to replace physicians on their boards who were not performing by referring their patients to NAHC facilities.  *Id*. ¶ 36.  He alleges that "based on his conversation and Sorensen's direction about what amount to pay doctors, Relator Orten estimated that NAHC was spending up to $10,000 a month on physicians who were expected to bring "value adds" i.e., Medicare patients to

9

NAHC facilities." *Id*. ¶ 56. According to Orten, the success of NAHC and Sorensen's strategy is shown by NAHC's far above average rate of patients covered by Medicare. *Id*. ¶ 57.

Sorensen argues that these allegations fail to state a FCA against him because there are no allegations that Sorensen submitted or caused to be submitted any claim that was tainted by the "kickback" arrangement. Nor are there any facts that Sorensen approved any specific bribes to any identifiable physician or caused specific employees to make those bribes.

Orten, however, has alleged that Sorensen was directly involved in implementing the kickback and regeneration scheme. He provides first-hand information – primarily from the May 18, 2010 videoconference – where Sorensen directed administrators to get physicians onto NAHC board who would refer patients to NAHC facilities at "any cost" and remove those who were not making referrals. This reference adequately describes a "scheme to submit false claims" that Sorensen promoted. *Ebeid v. Lungwitz*, 616 F.3d at 998-99.

Although Sorensen is correct that Orten does not allege facts showing that Sorensen personally approved kickbacks to any specified physicians or that a particular false claim was submitted, that is not necessary. Orten provides specific examples of kickbacks being provided by NAHC facilities, including a discussion Orten overheard where a NAHC regional representative approved providing a specific physician a $2000 bottle of wine (SAC ¶ 40), an allegation that a Dr. Ashok was being paid $1500 a month to be on a NAHC board in exchange for referrals, and other examples of the scheme being carried out at the Ramona facility with assistance from Dr. Ashok. SAC ¶¶ 41, 52-53. Orten also relies on statistics that demonstrate that the scheme resulted in a "stark statistical shift" in the percentage of NAHC residents whose bills were paid with Medicare funds. *Id*. ¶ 57. While none of these examples alone would be sufficient under 9(b), taken together they plausibly support Orten's assertion that Sorensen implemented a referral and regeneration scheme and that false claims were actually submitted. That is sufficient at this stage, particularly considering Orten's assertion that he refused to become involved in the alleged illegal conduct and, therefore, would not have direct knowledge of some of it. *See Ebeid*, 616 F.3d at 998-99 ("it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" (quoting

*United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

### C. Overbilling for Rehabilitation Services

The parties debate whether Orten has asserted overbilling or "upcoding" by NAHC as a basis for FCA liability, and if so, the government contends that Orten's claims should be dismissed under the public disclosure bar. Dkt. No. 70. Orten claims his precise and detailed disclosures are not barred and can form a basis for his FCA claim. Dkt. No. 71.

For purposes of ruling on Sorensen's motion to dismiss, I find that Orten has not explicitly rested his FCA claims on "upcoding" allegations and has not alleged any facts tying Sorensen to those claims. Orten is given leave to amend to make explicit his NAHC upcoding allegations and to plead facts showing that Sorensen may be liable for that conduct and that the public disclosure bar does not apply.

## II. CONSPIRACY

Sorensen argues that even if Orten has alleged adequate facts that NAHC violated the FCA, the SAC is devoid of sufficient facts to allege that Sorensen was part of a conspiracy to do so with agents outside of NAHC. Sorensen argues that under the "intra-corporate conspiracy" doctrine, he cannot be liable under the FCA for conspiring with other employees or officers of NAHC. The doctrine is an antitrust principle providing that a corporation cannot conspire with its own employees or agents. *United States ex rel. Campie v. Gilead Sci., I*nc., 2015 U.S. Dist. LEXIS 1635, *50 (N.D. Cal. Jan. 7, 2015) (relying on *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000)). The rationale likewise precludes a theory of FCA conspiracy between employees of the same corporation. *United States ex rel. Chilcott v. KBR, Inc.*, 2013 U.S. Dist. LEXIS 153331, *38 (C.D. Ill. Oct. 25, 2013) (collecting cases).[1] I agree that the doctrine applies in the FCA context and bars any conspiracy claims as between Sorensen and other NAHC

---

[1] Orten relies solely on two cases which declined to apply the intra-corporate conspiracy doctrine in the context of FCA claims because the underlying conduct could be subject to criminal conspiracy charges under 18 U.S.C. § 371. Oppo. at 17 (relying on *United States ex rel. Harris v. Lockheed Martin Corp.*, 905 F. Supp. 2d 1343, 1354 (N.D. Ga. 2012) & *U.S., ex rel. Beattie v. Comsat Corp.*, 2001 WL 35992080, at *3 (M.D. Fla. Apr. 18, 2001)). However, those two opinions are outliers and against the weight of authority on this issue. *See United States ex rel. Chilcott v. KBR, Inc.*, 2013 U.S. Dist. LEXIS 153331 at *39 (citing numerous cases applying doctrine to FCA claims).

employees.

Because Orten's SAC does not allege any facts expressly connecting Sorensen to non-NAHC employees as part of the alleged conspiracy to submit fraudulent Medicare claims, Orten's Second Cause of Action against Sorensen is DISMISSED with leave to amend.

### III.    STARK LAW

Sorensen moves to dismiss Orten's Third Cause of Action for violation of the Stark Law, arguing that the Stark Law does not provide a private right of action.  Motion at 19.  In his Opposition, Orten makes repeated references to the Stark Law, but in the context of attempting to explain why he has adequately alleged a violation of the Federal False Claims Act against Sorensen.  *See, e.g.*, Oppo. at 10-12.  Nowhere does he address his purported right to bring a stand-alone cause of action under the Stark Law.  *But see St. Agnes Med. Ctr. v. Dogali*, 2010 U.S. Dist. LEXIS 9112, *11 (E.D. Cal. Jan. 15, 2010) ("The purpose of the Stark Law is to protect the government from Medicare fraud and there is no indication that any private right can be extrapolated therefrom.").

Orten's Third Cause of Action is DISMISSED with prejudice.

### IV.    STATE FCA CLAIMS

Sorensen moves to dismiss claims under the California and Washington False Claims Acts (Cal. Govt. Code § 12650 *et seq*.; WA Rev. Code § 74.66.005 *et seq*.).  As Sorensen points out, the SAC is devoid of any factual allegations regarding a scheme orchestrated by Sorensen to submit fraudulent claims to California or Washington state agencies under their Medi-Cal and Medicaid programs or otherwise how those states were injured as a result of false claims.  In Opposition, Orten argues that submission of false federal claims necessarily implies submission of false state claims (Oppo. at 15-16), but arguments based on implications are insufficient to state claims under Rule 9(b).

Orten's Fourth and Fifth Causes of Action against Sorensen are DISMISSED with leave to amend so that Orten can plead facts showing how false claims were submitted to the states in violation of the California and Washington statutes.

## V. RETALIATION AND WRONGFUL DISCHARGE

Sorensen moves to dismiss Orten's retaliation claims – asserted under Federal and California law—and Orten's wrongful discharge claim under California law. Orten does not oppose the dismissal of his California law claims, conceding that Sorensen cannot be considered an "employer" under California law. Oppo. at 2 n.1. Orten's Seventh and Eighth Causes of Action against Sorensen are DISMISSED with prejudice.

With respect to Orten's Federal retaliation claim under 31 U.S.C. § 3730(h), Sorensen contends that he likewise cannot be liable as he was not Orten's "employer." Orten relies on the text of the statute, which as amended in 2009, does not contain express language limiting claims to those against an "employer." Prior to 2009, the statute provided a cause of action for "[a]ny employee who is discharged . . . by his or her employer because of lawful acts done by the employee. . . ." *Yesudian ex rel. United States v. Howard Univ.*, 270 F.3d 969, 972 (D.C. Cir. 2001). As such, only "employers" and not supervisors or others in their individual capacity could be liable under the statute. *Id*. In 2009, Congress amended the section to expand the class of plaintiffs who could bring retaliation claims to any "employee, contractor, or agent." *See* Pub. L. 111-21, § 4(d), 123 Stat. 1624 (May 20, 2009). Following that amendment, district courts disagreed on whether the class of defendants who can be held liable was also expanded. *Compare Weihua Huang v. Rector & Visitors of the Univ. of Va.*, 896 F. Supp. 2d 524, 548 n.16 (W.D. Va. 2012) ("However, by eliminating the reference to 'employers' as defendants in § 3730(h)(1), the 2009 amendment effectively left the universe of defendants undefined and wide-open."); *with United States v. A Plus Physicians Billing Serv., Inc.*, 2015 U.S. Dist. LEXIS 110085, *14 (N.D. Ill. Aug. 20, 2015) (the "Court agrees with the reasoning of *Aryai* and its progeny that the 2009 amendment to § 3730(h) did not create individual liability for FCA retaliation claims.").

In a detailed analysis of the cases prior to and after the amendment, as well as the legislative history of the 2009 amendment, the Hon. Jon S. Tigar of this District concluded that "the 2009 amendment did not expand liability to individuals such as the individual Defendants named here, *e.g.,* coworkers, supervisors, or corporate officers who are not employers, or who lack a contractor or agency relationship with the plaintiff." *United States ex rel. Fryberger v. Kiewit Pac. Co*., 41 F. Supp. 3d 796, 814 (N.D. Cal. 2014) (citing cases); *see also Lampenfeld v. Pyramid*

*Healthcare, Inc.*, 2015 U.S. Dist. LEXIS 26552, *10 (M.D. Pa. Mar. 4, 2015) ("Although a few early cases came to the conclusion that this was a deliberate maneuver and thereby allowed claims to proceed against individual supervisors . . . , a consensus has now emerged among the majority of courts to decide this issue that individual liability does not exist under the amended § 3730(h)."). I find Judge Tigar's analysis persuasive and conclude that because Sorensen as the CEO of NAHC was not Orten's "employer," he cannot be individually liable under 31 U.S.C. § 3730(h) for retaliation. Orten's Sixth Cause of Action against Sorensen is DISMISSED with prejudice.

## CONCLUSION

Sorensen's motion is GRANTED in part and DENIED in part. Orten's Third, Sixth, Seventh, and Eighth causes of action for violation of the Stark Law and retaliation and wrongful discharge are DISMISSED with prejudice as to Sorensen. Orten's First, Second, Fourth, and Fifth causes of action are DISMISSED with leave to amend within thirty days of the date below.

**IT IS SO ORDERED**.

Dated: November 9, 2015



WILLIAM H. ORRICK
United States District Judge