C. Brooks Cutter (SBN 121407)
John R. Parker, Jr. (SBN 257761)
CUTTER LAW, P.C.
401 Watt Avenue
Sacramento, California 95864
Telephone:  (916) 290-9400
Facsimile:  (916) 669-4499
E-mail:      bcutter@cutterlaw.com
               jparker@cutterlaw.com

Edward P. Dudensing (SBN 182221)
DUDENSING LAW OFFICE
1414 K Street, Suite 470
Sacramento, CA 95814
Telephone: (916) 448-6400
Facsimile: (916) 448-6401
Email: Ed@dudensinglaw.com

*Attorneys for Relator*

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JOHN ORTEN, Relator, | Case No. 14-cv-02401-WHO |
| STATE OF CALIFORNIA ex rel. JOHN ORTEN, Relator | **THIRD AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT, VARIOUS STATE FALSE CLAIMS ACTS, VARIOUS STATE EMPLOYMENT CLAIMS AND DEMAND FOR JURY TRIAL** |
| STATE OF ARIZONA ex rel. JOHN ORTEN, Relator | |
| STATE OF WASHINGTON ex rel. JOHN ORTEN, Relator | |
| STATE OF UTAH ex rel. JOHN ORTEN, Relator | |
| Plaintiffs | |
| vs. | |
| NORTH AMERICAN HEALTH CARE. INC., JOHN SORENSEN. | |
| Defendants. | |

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## 1.  INTRODUCTION

1.     North America Health Care, Inc. ("NAHC") is an owner and operator of for-profit skilled nursing facilities throughout the United States.  NAHC has engaged in a pattern of unlawful conduct in an effort to artificially inflate the number of patients in its facilities who are eligible to receive Medicare reimbursements.  These efforts resulted in NAHC receiving Medicare payments that were not covered by the skilled nursing facility benefit, and were not medically reasonable and necessary.  Moreover, NAHC engaged in unlawful conduct in an effort inflate its Medicare Star Rating at its numerous facilities.  NAHC uses its Medicare Star Rating as a cornerstone of its marketing efforts to reassure families of the quality of care provided in its skilled nursing homes.

2.     Moreover, NAHC had financial relationships with various doctors to which the Federal Anti-Kickback Statue and the Stark Law applied.  NAHC provided illegal and excessive remuneration to doctors for illegal patient referrals and for assistance with the fraudulent regeneration of Medicare benefits for its residents.  NAHC required doctors with whom they had a financial relationship to refer Medicare patients from local acute care hospitals to its skilled nursing facilities.  NAHC attempted to disguise its payments as "consulting fees" or "compensation" for membership on its facilities' boards.  The payments constituted remuneration as an offer to induce and/or compensate doctors for Medicare referrals and the payments greatly exceeded the fair market value of any services (and/or sometimes no service) the doctors performed.

3.     Medicare pays nursing home facilities a daily rate to provide skilled nursing and skilled rehabilitation therapy services to qualifying Medicare beneficiaries.  Many

patients become eligible for 100 days of the skilled nursing facility benefit after a qualifying 3-day stay in an acute care hospital.  Moreover, skilled nursing home facility residents who have exhausted their benefit can re-qualify for another 100 days if, during their stay at a nursing home it becomes medically necessary for them to transfer back to an acute facility, and they remain at the acute facility for a 3-day qualifying stay.  The difference between the Medicare reimbursement to the facility for skilled care, as compared with the Medi-Cal rate (for which most remaining residents qualify) can be much as a 400% increase, *per-day*.   Thus, regenerating 100 days of Medicare reimbursements can significantly increase revenues for NAHC facilities.[1]

4.       NAHC's efforts to regenerate residents' Medicare reimbursement qualifications resulted in a stark statistical shift in the percentage of residents in its facilities whose bills were paid with Federal Medicare funds.  The overall California statewide average for the percentage of days paid Medicare for all nursing homes was 16.4%.  NAHC's averages exceeded that in every facility except three.  It grossly and disproportionately exceeded the overall statewide average for every other facility, having as much as 85.4% (Lake Balboa) and 63.1% (Terrace View Care Center) of its days paid by Medicare for one its facilities; and the great majority of the remaining facilities in the 30-50% range.

5.       In order to increase the number of Medicare beneficiaries at its facilities, NAHC illegally provided monetary and other incentives for physicians who were willing to act as board members for its local skilled nursing facilities and thereafter funnel patients to its facilities. In exchange for monetary payments and other incentives, these doctors directed discharging patients who qualified for the Medicare skilled nursing facility benefit, to NAHC-owned nursing

---

[1] While Medicare is more profitable for Defendants than Medicaid, the two programs are not mutually exclusive. Medicaid provides coverage in situations when Medicare will not.  For example, after the twentieth day of a stay at a skilled nursing facility covered by Medicare, a patient's co-ninsurance becomes partially responsible for paying the bill.  For Medicaid-qualifying patients, Medicaid acts as the co-insurance.

homes in their area.  Worse, these same doctors receiving monetary and other incentives from NAHC would, without medical necessity, order NAHC nursing home residents to acute care hospitals as a means of regenerating another 100 days of Medicare for the NAHC nursing home. Once the resident had re-qualified for the skilled nursing facility benefit after a 3-day stay at the hospital, the doctors redirected him/her back to the same NAHC nursing home.

6. Medicare.gov and Nursing Home Compare issue a star rating for nursing home facilities in the Untied States.  Consumers can view the star ratings online and companies like NAHC often use a 5-Star rating as a marketing tool.  The overall star rating is based on three domains: (1) health inspections (2) quality measures and (3) staffing.  Star ratings for each domain and the overall rating range from 1 star to 5 stars, with more stars indicating better quality.  The quality measures and staffing domain rely solely on information submitted to the government from the facility.  The "health inspection" domain is based on annual state-government surveys completed at the skilled nursing facilities.  When surveyors deem skilled nursing facilities in violation of a state or federal regulation they issue the home a deficiency. NAHC engaged in a practice of paying doctors large sums of money to sign letters authored by NAHC employees challenging the legitimacy of state issued deficiencies in an attempt to persuade surveyors to reverse their findings.  Moreover, NAHC engaged in a practice of misreporting its staffing levels in order to obtain a higher star-rating.

7. NAHC directors and managing agents intentionally create an environment where financial bonuses are provided to management as a means compelling administrators to engage in this pattern of fraudulent conduct.  NAHC directors and managing agents set Medicare census standards and profitability goal-standards that cannot be accomplished except by engaging in the illegal kickback schemes with area doctors to generate and maintain a high Medicare census.  NAHC's corporate strategy and pressure succeeded in significantly increasing the

THIRD AMENDED COMPLAINT

percentage of Medicare residents in its facilities.  NAHC's overall percentage of Medicare patients in its facilities far exceeds the national average.

8.    Those who refuse to engage in the illegal conduct are ostracized, criticized, threatened, harassed, demoted, terminated and/or otherwise retaliated against.  NAHC illegally engaged in retaliation against and unlawfully terminated employees who refused to participate in illegal kickbacks to physicians; who expressed their concerns that administrators and mangers were engaged in a pattern of illegal conduct by generating and regenerating Medicare patients; and who expressed their concerns by submitting complaints or tips to the Office of the Inspector General.

9.    Had the United States and the several States known that NAHC was submitting Medicare reimbursement requests from its facilities for beneficiaries secured through illegal kickbacks to physicians in acute facilities, the United States and the several States would not have funded these illegal kickbacks after the fact by providing reimbursement for these NAHC residents.  Moreover, had the United States and the several States known that NAHC was engaging in illegal payments to doctors for signing or authoring letters in a effort to secure a higher star rating after receiving state-issued deficiencies, the United States and the several States would not have awarded the same star-rating issued to NAHC facilities. Moreover, had the United States and the several States known that NAHC was submitting falsified and inaccurate staffing data in a effort to secure a higher star rating, the United States and the several States would not have awarded the same star-rating issued to NAHC facilities.

10.    Had the United States and the several States known that NAHC was obtaining Medicare eligible residents from physicians with whom the corporation had an unlawful financial relationship in the form of excessive and illegal remuneration, the United States and the several States would not have funded reimbursements for the residents.  The

THIRD AMENDED COMPLAINT

financial relationship between NAHC and these referring physicians caused the multitude of referrals between the parties to be strictly illegal and had the direct effect of significantly increasing the amount of residents for which NAHC received Medicare reimbursements. Accordingly, Defendants' unlawful relationship had the indirect effect of increasing the amount of money spent by the federal government and the States for payments and reimbursements covered by Medicaid, Medicare, and the TRICARE health care system.  This illegal relationship and the cost to the federal government represents a violation of the Stark Law, in violation of 42 U.S.C §1395nn.

11.     The kickbacks described in this Complaint are strictly illegal and have had the direct effect of greatly increasing the amount of NAHC residents that have been paid for and reimbursed by the government.  Accordingly, Defendants' kickbacks have had the indirect effect of increasing the amount of money spent by the federal government and the States for payments and reimbursements covered by Medicaid, Medicare, and the TRICARE health care system for members of the military and their families. Defendants' kickbacks to physicians represent the inducement of payment from the government through a pattern of fraudulent conduct, constituting false claims within the meaning of 31 U.S.C. § 3729 and the relevant provisions of the state false claims and Medicaid fraud statutes.

12.     The States paid Medicaid and Medi-Cal funds to Defendants to pay "regenerated" patients, "upcoded" patients, and to pay for the care of patients as result of kickbacks Defendants provided to providers.

13.     Relator John Orten, an award-winning nursing home administrator, was terminated by NAHC after he refused to engage in bribes and related kickbacks to doctors in the company's unlawful efforts to maintain its facility's Medicare.gov star rating. CEO John Sorensen and other managing agents of NAHC specifically instructed Relator Orten to bribe

doctors in an effort to have doctors sign pre-drafted NAHC letters challenging the legitimacy of state issued deficiencies during the survey process at Orten's NAHC facility.  Defendants instructed Orten to then provide the doctors' paid-for letters to state inspectors during the appeal process in an attempt to persuade inspectors that the deficiencies issued during the facility inspection were improper.  The letters provided as a result of the bribe and/or unlawful payments would have the intended effect of allowing NAHC facilities to maintain its Medicare.gov 5-star rating.  When Relator Orten refused to engage in the bribery and told Defendants he would not engage in the process he was retaliated against and ultimately terminated for his refusal.

14.     Additionally, Relator Orten discovered during his employment that administrators at other NAHC facilities were providing illegal kickbacks and payments to doctors as a means of increasing the number of Medicare patients in NAHC facilities. Relator Orten learned that illegal payments were made to doctors in an effort to secure Medicare referrals from acute care hospitals and to compel doctors to engage in the fraudulent practice of regenerating Medicare benefits for existing nursing home patients.  The unlawful conduct created unprecedented levels of profit for NAHC at facilities engaged in the conduct and had the effect of dramatically increasing the percentage of days it received reimbursement from Medicare.  Relator Orten reported this ongoing fraud to defendants on multiple occasions.  After reporting these unlawful practices defendants retaliated against Relator Orten.  Defendants engaged in a pattern of conduct designed to continually undermine Orten's ability to successfully manage his facility, bring it to profitability, and succeed as an administrator.  Defendants' conduct was perpetrated with the intent to create a pretext they could use to terminate Relator Orten for refusing to bribe doctors and for exposing the widespread Medicare fraud occurring in NAHC facilities.

15.     John Sorensen is intimately involved in every aspect of NAHC's business operations. Sorensen personally and through his executive staff pushes every NAHC

THIRD AMENDED COMPLAINT

administrator to pay as many physicians as possible to refer as many patients as possible to NAHC facilities.  If the physicians no longer referred patients Sorensen removed them from the "medical board" and other sinecures and kickbacks.  Sorensen and his staff, including executive Bryan Tanner, repeatedly verbalized this directive during administrator meetings and personal visits.

## 2.  PARTIES

16.     Relator John Orten is a licensed nursing home administrator and a former employee of North American Health Care, Inc.  In January 2007, Orten began his employment as the administrator of Ramona Care, Inc., d/b/a Ramona Nursing and Rehabilitation Center, a skilled nursing facility owned operated by defendant North American Health Care, Inc.  Ramona Nursing and Rehabilitation Center is located in El Monte, California.  At the time of his employment with Ramona Nursing and Rehabilitation Center, Orten was a resident of the state of California.

17.     In January of 2011, North American Health Care, Inc.'s management transferred Relator John Orten to Oren, Utah, where he was assigned as the administrator of a skilled nursing facility named Orchard Park Care Center.   Orchard Park Care Center is owned and operated by defendant North American Health Care, Inc.  At the time of his employment at Orchard Park Care Center, Orten was a resident of the state of Utah.  At the commencement of this action Orten continues to reside in the state of Utah.

18.     As an administrator for facilities owned and operated by NAHC, Orten regularly participated in company training events, conference calls, and face-to-face meetings where he interacted with various company executives and managers, including CEO John Sorenson.  Mr. Orten has developed first-hand knowledge of the fraud set forth in this statement, and amassed a large number of internal NAHC documents that detail the nature of Defendants'

THIRD AMENDED COMPLAINT

fraudulent scheme.  Mr. Orten is therefore an original source of the facts and information set forth in this Complaint concerning the activities of NAHC.

19.     The facts averred in this Complaint are based entirely upon the personal observations of Mr. Orten and documents in his possession.

20.     Mr. Orten has provided or is providing to the United States Attorney and the Attorneys General of California, Utah, Washington, and Arizona, a full disclosure of substantially all material facts supporting this Complaint, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2), and relevant state statutes.

21.     At all times mentioned herein, North American Heath Care Inc. (NAHC) is and was a corporation that owned, managed, controlled, maintained, and/or operated skilled nursing facilities in (4) different states in the United States, including 29 in California.  NAHC skilled nursing facilities include: Ramona Nursing and Rehabilitation Center in El Monte, California; and Orchard Park Care Center in Orem, Utah.

22.     At all times mentioned herein, John Sorensen was the Chief Executive Officer of North American Health Care, Inc.  At all times mentioned herein, defendant John Sorensen owned, managed, controlled, maintained, and/or operated Ramona Nursing and Rehabilitation Center and Orchard Park Care Center, among other nursing homes in the North American Health Care, Inc. chain of facilities.  As the company's CEO, and John Orten's supervisor, John Sorensen had personal knowledge of the facts alleged herein.   Upon information and belief, Mr. Sorensen resides in the Dana Point area, and is a resident of the state of California.

**3.  JURISDICTION AND VENUE**

23.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.  This court has

jurisdiction over the state law counts asserted in this Complaint under both 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367, because the state claims arise from the same transaction or occurrence as the federal claims and because these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

24.    At all times material to this Complaint, NAHC regularly conducted substantial business within the State of California, maintained permanent employees and offices in California, and made and is making significant sales within California.  NAHC is thus subject to personal jurisdiction in California.

25.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this district, market and promote its services to residents in this district, and operate facilities in this district.

## 4.   FACTS

26.    On May 1, 2006, Relator John Orten began his administrator-in-training program with NAHC.  David Sorensen, the original founder and CEO of the company (and father of current CEO John Sorensen), recruited and encouraged Orten to pursue his license with NAHC.  On November 1, 2006, after completing the 1,000 hour training program, Orten took and passed the state and federal examinations and received his nursing home administrator's license.

27.    On January 21, 2007, CEO John Sorensen and NAHC managing agents assigned Relator Orten to be the administrator at Ramona Nursing and Rehabilitation Center (hereinafter Ramona) in El Monte, CA.  At the time, Ramona was the worst performing facility in the company.

28.    In April of 2007, Orten received an email from NAHC Chief Operating Officer Tim Paulsen indicating that employees such as the Community Relations or Admissions Coordinators could receive bonuses based on Medicare census and Resource Utilization Group

("RUG") rates. (EXHIBIT 1).  Though the e-mail specifically excluded offering incentives to staff for government reimbursed services, this directive would ring hallow when viewed in conjunction with later corporate directives.  Increasing RUG rates and using bogus, often unneeded therapies were a key component of NAHC's drive early in Relator Orten's career to push the "gray areas" in an attempt to maximize the reimbursement rate its facilities received from the government.  NAHC VP of Patient Services Meg Galvezon told NAHC Administrators, including Relator Orten, that the company had a policy of "driving the Medicare speed limit," i.e., pushing the limit of maximizing its Medicare reimbursement, including though upcoding and using extremely questionable and unnecessary therapies. Relator Orten routinely noticed that Ramona had an extraordinary large percentage of its residents completely exhaust all 100 days on Medicare, only to be later "regenerated" by using the tactics described herein.

29.     Regardless of rehab potential, Relator Orten and his staff at Ramona were regularly pressured by NAHC managing agents to maximize the number of minutes and days a resident was provided therapy.  One such tactic NAHC pushed was the use of "ACP equipment" ("Accelerated Care Plus" equipment), particularly on lower-level patients in an effort to keep these residents on therapy as long as possible.  These modalities were used to send electrical waveforms or impulses through the resident's muscle. Relator Orten witnessed first-hand in his capacity as Ramona's administrator therapists lining up residents in wheelchairs, en masse, around the therapy gym with ACP electrodes attached to them for extended periods of time. Relator Orten witnessed this same practice occur over many months, with no real benefit to any of its users, but a huge windfall in therapy minutes NAHC could charge the government.  An ACP representative congratulated Relator Orten on Ramona's high utilization rate of ACP equipment.  Relator Orten viewed the therapy as a complete farce, never saw any benefit from it in his residents, and noted that most of them did not enjoy the undignified manner in which the

therapy was carried out.

30.     Relator Orten also witnessed therapies using the "ACP bike," a stationary bicycle that would continue in motion even if the resident stopped pedaling.  Relator Orten noticed this modality was routinely used on inappropriate residents, including those whose feet would be strapped into the moving pedals while they literally were asleep.

31.     Relator Orten was also aware, based on his personal conversations with Meg Galvezon, Minimum Data Set ("MDS") Nurses, and other staff and corporate executives that there was a pervasive use and practice of RUG upcoding occurring, especially as it related to Activities of Daily Living or "ADL's".  Meg Galvezon taught MDS coding during Administrator and MDS meetings on multiple occasions.  Relator Orten was present at these sessions and had personal knowledge of Defendants and Meg Galvezon's strategy to maximize Medicare reimbursements rates of residents by increasing RUG rates—both before and after March 29, 2010.  For example, as directed by Defendants and specifically John Sorensen, Meg Galvezon taught MDS coordinators to always code a two-person assist for transfers, toileting, and ambulating, any time a second person was merely in the room and touched the resident in any manner, regardless of whether it added to or assisted the ADL.  NAHC's practice clearly conflicted with the RAI (Resident Assessment Instrument) manual which instructed facilities and staff like Ramona's that, "dependence on others for ADL assistance can lead to feelings of helplessness, isolation, diminished self-worth, and loss of control over one's destiny."  The idea of maximizing independence and reducing the need for a "two-person assist" was never taught or mentioned NAHC because doing that for residents would have had the effect of reducing RUG rates, thereby reducing reimbursement values for those residents.  NAHC continued to perform unnecessary treatment on residents and engage in RUG up-coding on residents even after a March 29, 2010 Washington Post article mentioned that Representative Stark had asked the Department

THIRD AMENDED COMPLAINT

of Health and Human Services to investigate NAHC.  The unnecessary treatment and up-coding at NAHC was not limited to the Ramona facility, but also occurred at NAHC facilities in other states, including Washington.

32.     Sorensen was personally involved in the up-coding fraud both before and after the Washington Post article was published.  Not only was Sorensen aware of the up-coding fraud, but he actively encouraged the fraud by instructing staff to perform unnecessary treatments on residents in order to maximize profits for NAHC.  Sorensen knew that the treatments would be useless and the blanket usage of ineffective, but profitable treatments on residents ensured that many of the residents would receive treatment entirely inappropriate to their individual conditions.  Sorensen directed staff to choose treatments that would allow NAHC to bill the government significant amounts of money while requiring minimal resources from NAHC.  To further this goal, Sorensen worked with individuals outside of NAHC including doctors and administrators.

33.     By December 21, 2007 Ramona had achieved record annual profit under John Orten's leadership.    The following year was even more successful.  In October 2008 Orten was recognized for joining the "30+ Medicare Club," an NAHC award that recognized administrators whose facilities had 30 or more Medicare patients. (EXHIBIT 2).  In December 2008 Ramona's financials showed that the facility had nearly doubled its profitability from the record year in 2007.

34.     In August of 2009 the Director of Nursing at Ramona, Bong Flores, resigned after Orten wrote-up Flores for understaffing issues.  In his letter of resignation, Bong wrote, "I have led the nurses in an effort to bring our residents to the Hospital whenever needed, thereby regenerating their medicare days for them to benefit from Rehab in our facility…" (EXHIBIT 3.)  Later in the e-mail Flores wrote that he was interested in, "achieving what Mr.

Sorensen have [sic] challenged me to accomplish."  Orten believed that Flores was referencing regenerating Medicare benefits and was surprised how carefully NAHC treated Flores on his departure despite his many failings and the widespread criticism of him and his work at Ramona.

35.     At the close of 2009 financials for Ramona showed a record high profit margin. A review of the annual survey showed a 45% reduction in deficiencies from the previous year at Ramona.

36.     On or about February 8, 2010, NAHC CEO John Sorensen sent a company-wide email announcing the hiring of Dr. James Neel.  (EXHIBIT 4).  The e-mail indicated NAHC "Administrators and Officers had the opportunity to receive a formal audio/visual presentation defining a 'desired model of care and services' that I will not go into details about due to the confidential nature of the presentation."  (Id.)  Having attended that formal presentation, Relator Orten was acutely concerned about the direction North American managing agents and directors were steering the company.  At the presentation, corporate representatives for NAHC identified Dr. Neel and explained he would be tasked with working with facility administrators to select a rehab doctor who was well connected to a local hospital. NAHC instructed its administrators, including Orten, to contract with those local rehab doctors and compensate them extremely well, so long as there was an unwritten agreement that the doctor was to direct discharging acute hospital Medicare beneficiaries directly to the contracted NAHC nursing home.  This model was sold to administrators like Orten as a "legal" way to bribe doctors and receive more Medicare patients.

37.     On or about May 18, 2010, NAHC CEO John Sorensen held a videoconference meeting with all NAHC administrators.  Relator Orten attended this meeting in Regional Vice President Bryan Tanner's office in Chino Hills, CA.  During the meeting Sorensen asked, "How can we better serve our doctors?  How can we recognize them more?"  He then

answered his own question and emphatically repeated, "Just pay them!"  Sorensen then went on to analyze the monetary investment in doctors and how the investment translated to a "value add."  Sorensen specifically explained that the "value add" was the number of patients the doctors referred to NAHC facilities.  Sorensen directed administrators to securitize doctors on their medical review boards, and to get rid of doctors who were not referring patients to the administrator's facility.  Sorensen told administrators to bring on doctors, "for whatever costs," who would continually generate referrals.  Sorensen directed administrators to consider, "bringing on physicians to be a member of the board," and indicated administrators should, "pay those physicians more to be on the board if you have to."  Sorensen concluded the meeting by reiterating that it was the administrator's goal to get doctors on their board who would agree to send Medicare patients to their NHCA facility.  "Then just pay them," Sorensen directed.  "That's the key."

38.      Sorensen and NAHC corporate managing agents created an atmosphere of continual pressure on administrators to maximize Medicare reimbursements and propagated a company-wide sense of entitlement to large profits from government funds.  In August of 2010, CEO John Sorensen authored a memorandum that indicated: "If staff members are puzzled on a reduction in staffing or money in their budget, explain that the government sets the rates, and we are reimbursed to staff according to those rates.  Your facility is entitled to a profit – a very large and generous profit based on your excellent care and service."  (EXHIBIT 5).  The memorandum details tactics administrators could use to reduce costs while maximizing profits.  Relator Orten quickly learned that the profitability expectations ultimately placed on facility administrators could only be achieved by engaging in the "value add" Medicare scheme outlined in May 2010.

39.      John Sorensen, Curtis Reese and Bryan Tanner, all managing agents of NAHC, regularly told administrators, including Relator Orten, in meetings, and in individual

telephone calls and face-to-face visits, to find doctors who would refer patients to their facility and "pay them."  Payment included stipends to doctors as part of being on NAHC's "medical board," a functional sinecure only available to those doctors who followed the clear but unwritten rule that continual referral of patients was required in exchange for the board position.  The board pay was above market-value and a kickback in order to secure more patients from hospitals. NAHC also began directing Relator Orten and other administrators to institute a "Rehab Medical Director model," where a rehabilitation doctor would be paid a stipend as a "Rehab Medical Director" and would be paid to refer patients. Rehab Medical Directors who did not refer patients were cut off from the stipends.  Even worse, Relator Orten learned from his interactions with these doctors that these "rehab medical directors" were taught to bill and use codes in addition to what the regular attending physician was billing for residents.  Relator Orten and other administrators were specifically told to replace physicians on their medical boards who were not performing by referring their patients to NAHC facilities.

40.     At all times relevant to this complaint NAHC placed extreme value on its Medicare.gov and Nursing Home Compare "star rating."  During Relator Orten's employment NAHC used the star rating of its facilities as a primary marketing tool, featuring an explanation of the rating on its corporate website and highlighting the receipt of 5-Star ratings on individual facility webpages.  In September 2010, NAHC CEO John Sorensen informed Orten that a four star rating in staffing was "unacceptable" and "not good enough," despite the fact Orten believed he could maintain his overall 5-star rating while reducing costs related to staffing levels. (EXHIBIT 6).  At the same time Sorensen was instructing him a 4-star staffing rating was unacceptable, Orten was being cautioned by his regional Vice President, Bryan Tanner, that his staffing costs at 4-star levels were already $300,000 higher than the previous year (EXHIBIT 7). Orten immediately realized that there was no way to achieve reduced labor costs and maintain a

five-star staffing level unless he or someone else was willing to fraudulently report his staffing numbers.

41.     At the end of 2010 Ramona reported increased profits from the prior year to a record high for the facility.  In late January 2011, Relator John Order was invited to and attended the Administrator's Awards Banquet in Dana Point, CA. At the event Orten received several company awards, including the $15,000.00 Census award (for maintaining the highest average percentage of beds filled in a year) and the prestigious $25,000.00 Presidents Award – an honor hand-picked by NAHC CEO John Sorensen for, "recognition of [his] excellence in patient services and overall outstanding business leadership."  (EXHIBIT 8).

42.     On information and belief, payment to NAHC as a Medicare/Medicaid provider explicitly linked compliance with underlying regulations that formed the basis of the star rating program to receiving payment for NAHC facilitiy services.  Defendants fraudulently undermining the data used to generate the ratings would result in denial of reimbursement.

43.     In October of 2011, John Sorensen instructed administrators during a company-wide administrators meeting, "We need to focus on Part B."  (EXHIBIT 9).  Thereafter NAHC began a corporate push, spearheaded by Meg Gelvezon to have administrators direct therapists to re-evaluate therapy needs of those existing long-term residents who were eligible for Medicare Part B.  Medicare Part B is typically only utilized for long-term patients who reside in the facility, and covers therapy and limited ancillary services after their Medicare Part A stay has ended.  Administrators were directed to institute these re-evaluations when their Medicare Part A census was low.  Meg Gelvezon and her team's push for Medicare Part B therapies and services led to patients being reclassified when it was not medically necessary or appropriate in NAHC facilities.

44.     Whether focused on Medicare Part A or B, NAHC continued to use

monetary kickbacks and other enticements to doctors in order to secure Medicare referrals.  On one specific occasion John Orten was traveling with Jeremy Jergensen, a regional corporate representative for NAHC, when Mr. Jergensen received a call from the administrator of the Palm Terrace facility, AJ Eliason.  Over speakerphone, Mr. Eliason asked Mr. Jergensen if he would authorize a purchase of a $2,0000.00 bottle of wine that a doctor was requesting.  Mr. Jergensen's response was, "What do you think the return will be?  Will he start sending you patients."  The conversation concluded with Mr. Jergensen authorizing the purchase if Mr. Eliason felt this doctor was going to be a "value add." This was NAHC's pervasive attitude toward getting and securing residents – whatever it took, so long as the value would come back to NAHC by way of Medicare dollars through patients garnered through doctors receiving and sometimes even seeking out kickbacks or monetary payments for illusory board positions.

45.     During his tenure at Ramona, Janelli Savellano, the case manager at Greater El Monte Community hospital, approached Relator Orten for marketing purposes.  Savellano asked Orten to find patients to send to Greater El Monte Hospital, even if there was no medical necessity for the transfer.  Savellano explained, "Just send the patients to us and we will make sure the documentation looks good."  Orten refused to engage in the practice.   In November of 2011 NAHC hired Angela Araneta as a marketer for Ramona Nursing and Rehabilitation Center.  Araneta was very close friends with Janelli Savellano.  Shortly thereafter, Relator Orten learned that Angela Araneta negotiated with Dr. Ashok and requested NAHC pay him $1,500.00 per month to be on Ramona's medical board.  In exchange, Dr. Ashok promised Ramona would start getting his Medicare patients.

46.     In late November 2011, Relator John Orten learned that the administrator at Orchard Park Care Center, a NAHC skilled nursing facility in Orem, Utah, was resigning.  CEO John Sorensen, Regional VP Bryan Tanner and COO Tim Paulsen informed Orten in

December 2011 that he was being transferred to the Utah facility and that he need to be there as soon as possible.  Orten knew that the Utah facility was in the midst of a complete remodel and that it was a financially challenged facility.  Orten expressed concerns about the status of the Utah facility and its ability to be profitable.  Sorensen, Tanner and Paulsen repeatedly reassured Orten that the remodel would be finished within a few months at the very latest.  Sorensen told Orten, "You shouldn't and you won't have to worry about the remodel.  You won't have to worry about that.  You cut costs."  With that understanding and the promise that NAHC would provide the support and resources to turn the building around, Orten agreed to the move.  A few days later, in an email to John Orten debating whether he was eligible for a year-end bonus, John Sorensen wrote, "I enjoy serving with you very much and hope to do so for many, many more years." (EXHIBIT 10).

47.     John Orten relocated to Utah on December 31, 2011 and began as the administrator at Orchard Park Care Center (hereinafter Orchard Park).  Within three weeks at the facility Orten increased his Medicare census from single digits to 20 patients.

48.     On and between January 30, 2012 and February 2, 2012 state inspectors arrived at Orchard Park to conduct the annual survey/audit.  It had been 22 months since the previous audit, which resulted in 3 deficiencies in 2010.   Orchard Park received 17 deficiencies, including (3) G rating deficiencies.  Deficiencies are associated with an alpha character that denotes the type and extent of harm.  A "G" rating indicates actual harm to residents.  During the survey, Orten convinced surveyors to remove one of the G rating deficiencies.  The change left 17 deficiencies, with (2) G ratings.  If upheld, these audit results meant Orchard Park would lose its five-star Medicare rating.

49.     On February 7, 2012 John Orten received a phone call from Bryan Tanner. During the 13-minute conversation, Tanner informed Orten that NAHC executives were

instructing Orten to "pay the doctors $1,000.00, $5,000.00, $10,000.00 – whatever it takes" in order to get the doctors to write whatever Orchard Park needed to get rid of the deficiencies. Tanner instructed Orten to, "Write it for them, give them $10,000.00 if you need to, just pay them whatever it takes to sign the letter." Orten told Tanner that he did not need to bribe the doctors, that he had a good enough relationship with them that they would be willing to write their own letters. Tanner did not respond to this comment. Following their conversation Orten sent an email to Tim Paulsen and Bryan Tanner informing them of the steps he was taking to address the survey. In the email Orten wrote that he, "spoke with several doctors who have agreed to write letters of recommendation for us." (EXHIBIT 12). Orten intentionally omitted any mention of paying doctors, specifically intending not to engage in that unlawful conduct. The following day, February 8, 2012, John Sorensen responded to Orten's email, changing the subject line to add in the phrase "Extremly [sic] urgent." Sorensen's email instructs Orten, "Please offer to write the letters for the physicians and take them to their offices, and have their office manager put it on their letter head. Pay whatever price you have to. I would consider offering the doctor(s) an additional $1,000 today to get the letters today." (Id.) Orten clearly understands the "additional $1,000" to be in addition to the amount Bryan Tanner directed him to pay the doctors in their telephone conversation. In a follow-up email later that afternoon, Sorensen informs Orten that this strategy has worked in the past for North American and that, "it's not that difficult, you simply write up the doctors view of the deficiency and why it is not founded, and you have the doctor put this commentary on his letter head, date it, and sign it." (Id.) Other high levels executives cc'd on the email agreed with the strategy and offered encouragement. John Orten reiterated that he would not bribe the doctors, or write the letters for them, but that he would have them write their own letters.

    50.    During the midst of the emails between Orten and Sorensen on February 8,

2012, Sorensen sent an email to all administrators reiterating that the five-star raking is "the absolutely most important aspect of yours and my stewardship" and that "if any of your facilities lose their five star status, you and I will be penalized very, very substantially on our bonus income." (EXHIBIT 13.)

51.     Following Orten's email exchange with NAHC executives wherein he refused to bribe doctors, John Sorensen never spoke with Orten ever again.  Instead, he and other executives engaged in a pattern of conduct designed to undermine Orten's ability to successful manage Orchard Park and bring it to profitability.  NAHC managing agents engaged in this pattern of conduct in order to create a pretext they could use to terminate Orten, who had already proved himself to be one of the company's most successful and proven administrators.

52.     Sorensen worked tirelessly to ensure NAHC facilities received top star ratings and his conduct in this regard was uniform throughout NAHC facilities in California and Washington.   Whenever Sorensen believed there was a risk of not receiving the top ratings due to poor audit performance, he instructed the local NAHC administrators to pay local doctors to write favorable letters.  Sorensen relied on this tactic regularly because it was not possible for the facilities to maintain top ratings on the budget he wanted them to run on.  At times, Sorensen personally contacted doctors and offered them payment in exchange for the letters.

53.     Relator Orten began to notice that the remodel efforts at Orchard Park were repeatedly slowed or halted by NAHC and that all levels of management began withdrawing their support of his operations following his refusal to bribe doctors.  After being repeatedly assured that the remodel would be finished in early 2012, the work was stymied for months.  NAHC managing agents eliminated Orten's ability to direct phases of the project, and then criticized him for the projects failures.  The project was even completely halted at one point so that the contractor could be reassigned to work at John Sorensen's second home in California.  In

addition, NAHC managing agents criticized Orten for longstanding issues at the facility that existed prior to his arrival, such as the accumulation of clutter and trash over an 18-year-perod and a lack of window coverings that had been specially ordered by those tasked with designing the building.

54.    NAHC managing agents also engaged in a pattern of conduct to undermine the morale at the Orchard Park facility, repeatedly lending support to an underachieving, divisive director of nurses (DON) who many of the staff openly criticized directly to NAHC management. (SEE EXHIBIT 14 and 15). When John Orten reported his concerns about the DON to NAHC, corporate executives lent her praise, awards and support; all to the dismay of those in the facility. Critical nursing issues remained a concern at the facility and when the DON threatened to leave, instead of welcoming the change, NAHC executives criticized Orten's handling of the situation. NAHC executives instead offered the DON a significant raise.  Ironically, less than a month later, Orchard Park lost its 5-star rating due to quality measures – the measure which rates nursing services in the facility – those services controlled by the DON.

55.    On February 28, 2012 Relator Orten learned that Ramona jumped to an all-time record high of Medicare patients within 51.  Based on his training and experience as an administrator and his specific experience at the Ramona facility, Orten knew this number did not match the Medicare demographics in the region.  Orten knew this number could not have been reached ethically, especially in such a short period since his departure. At the time of his departure Ramona was virtually at capacity with many long term residents, therefore Orten knew it was impossible to reach the Medicare levels being lauded by NAHC corporate unless Ramona was "regenerating" Medicare by sending out its own patients, or very quickly getting rid of many residents who were not Medicare beneficiaries.  John Orten contacted Regional VP Bryan Tanner and reported his concerns that this result was impossible absent fraud.  He asked Tanner to

THIRD AMENDED COMPLAINT

investigate the situation and determine how Ramona staff was generating these admissions. Orten never heard back from Tanner, but instead witnessed continual praise of the efforts made by Ramona staff in company-wide emails.

56.     In April of 2012, Christine Bak, a marketing representative at Ramona, announced her resignation from the facility citing ethical concerns relating to the administrator (JD White) and her marketing counterpart (Angela Araneta). (EXHIBIT 16 & 17).  Bak contacted Relator Orten and relayed her concerns of the practices at Ramona.  In multiple email exchanges with Bak and conversations with other employees, including the director of nurses at Ramona, Orten learned of the extensive fraud occurring at the facility.  Angela Araneta, JD White and Dr. Nagasamudra Ashok engaged in a pattern of unlawful conduct in an effort to artificially inflate the number of patients in the Ramona facility who were eligible to receive Medicare reimbursements.  They accomplished this by sending out facility residents to acute care facilities to "regenerate" 100 days of Medicare even when it was not medically necessary, and even at times when it was against the patient's treating nurse's recommendation.  Araneta kept a list of all Ashok's patients and alerted him when the patient reached the 60-day mark on his/her skilled nursing facility benefit.  Ashok would then order the patient readmitted to the hospital for another 3-day qualifying stay.   Ashok thereafter funneled the patient back to Ramona, which could then collect another 100 days of Medicare reimbursements for its services.  NAHC compensated Ashok with money and other forms of kickback payments for engaging in this process.  Angela Araneta was compensated and received bonuses from NAHC based on the facility's Medicare census.  Ramona's administrator, JD White was aware of this scheme and repeatedly ignored staff members who would bring it to his attention.  Orten learned from several sources that JD White had begun expressing concerns of being caught, but White took no steps to stop the practice and retaliated against employees who expressed their own concerns.

THIRD AMENDED COMPLAINT

57.     In addition, Orten discovered that Araneta developed a relationship with local hospital emergency room staff who would "assign" patients to Ramona despite the patient not having a 3-day qualifying stay.  Once the patient was at the facility, Ramona staff would assign the patient to Dr. Ashok, who would in turn immediately send the patient out to a different hospital to generate a qualifying 3-day stay.  Once the patient was qualified for the skilled nursing facility benefit, Dr. Ashok would transfer the patient back to Ramona where the facility could then bill Medicare for its services.  Araneta would work in conjunction with her close friend, Janelli Savellano, doing what she had offered to do for Orten during his tenure at Ramona – make the paperwork at the acute care facilities look appropriate under the circumstances after the transfers.  Relator Orten had multiple telephone conversations with Marylyn Schumacher, the Director of Nurses at Ramona.  Ms. Schumacher told Relator Orten exactly what was happening, stating specifically, "These are all the same residents." She explained that the population was the same, but the residents had been sent out to regenerate their Medicare days.

58.     Relator Orten learned via e-mails and personal conversations with those involved that the reassignment of residents was not limited to Ramona, but included many of the NAHC facilities.  In addition, Ashok's relationship extended beyond just NAHC. Ashok attended patients in as many as 20 other non-NAHC skilled nursing facilities in the region.  Angela Araneta told Relator Orten she had a list of all of his residents – those in NAHC facilities and those in other competitor locations. It became commonplace for Ashok to transfer residents from other facilities to NAHC facilities or transfer those residents to an acute hospital for a qualifying 3-day Medicare stay to regenerate their benefit, and then funnel those patients to a NAHC facility. Using this tactic promulgated by NAHC corporate managing agents, facility operators working in conjunction with paid doctors could use their facilities as hubs for Medicare patients acquired from other skilled facilities, acute care hospitals, or regenerated from long term residents already

residing at NAHC facilities.  This widespread approach, which extended beyond the 148 beds at

Ramona (or the other similar number of beds at other NAHC facilities) was successful despite the

60-day waiting period required by Medicare to regenerate the skilled nursing benefit, as the

facility was not limited to its own residents.  Using paid doctors, including those who attended at

other skilled nursing facilities, the pool of potential Medicare eligible residents, or those who

could be regenerated following a 60-day wait period at their end of their prior benefit, increased

exponentially.  For those residents inside NAHC facilities, as soon as their 60-day wait period

expired, efforts were immediately made to regenerate their benefit.

59.     The percentage of dual coverage residents, that is, those eligible for both

Medicare and Medi-Cal at Ramona was a substantial.  Relator Orten had made efforts during his

time at Ramona to develop long-term residents who truly were long-term need residents after

their Medicare benefit exhausted.  After his departure, he learned from the Director of Nursing at

Ramona that this plan had been abandoned entirely, and that all efforts were being made to focus

on regeneration of those very residents, or to replace those long-term residents with high-acuity

Medicare residents.  The difference in the reimbursement rates between Medicare and Medi-Cal,

according to Orten's experience, could be substantial.  For instance, the reimbursement rate for a

long-term resident on Medi-Cal was approximately $152 per day.  Comparatively, the

reimbursement rate for a regenerated Medicare resident with a high RUG rate could be upwards

of $700 or even $800 dollars a day.   The fraud was compounded by NAHC's efforts to maximize

the RUG rates of any and all Medicare eligible resident, something OIG had been investigating

since 2008.  The Director of Nursing made the comment to Relator Orten, "These are all the same

patients."

60.     Defendants' practices at Ramona were typical of those at other NAHC

facilities in California and Washington.  These facilities also paid physicians to refer patients and

commit the same kind of regeneration fraud that Ashok committed in which residents were admitted to hospitals to reset their Medicare counter.  These facilities also worked in concert with people outside of NAHC including without limitation Janelli Savellano, who worked at local hospitals and were able to use their influence to direct patients to NAHC facilities, and including Dr. Nagasamudra Ashok and other physicians who directed patients to NAHC facilities as part of Defendants' ongoing fraudulent schemes.  Sorensen personally recruited these NAHC outsiders to be participate in Defendants' ongoing fraudulent schemes.

61.     In addition, Orten learned that Ramona staff falsely reported its staffing data in order to maintain its Medicare star-rating.  On or about June 21, 2012 Gemma Mercado, the administrative assistant at Ramona, contacted Orten and expressed concerns about having to calculate staffing levels at the direction of her facility administrator, JD White.  Mercado explained that state surveyors had requested staff at Ramona to provide data, which the surveyors could use to calculate Ramon's staffing star-rating for Medicare.gov.  Mercado told Orten that JD White instructed her to copy the numbers submitted the prior year under Orten's administration and to not report the actual numbers.  Mercado told Orten that White said Ramona would lose its five-star rating if the surveyors were provided the correct figures.  In fact, White had been informed numerous times by the director of nursing over the months and weeks leading up to the survey that they need to increase staffing levels or they would lose their five-star rating.  Orten noticed when the results were returned that Ramona kept its five-star staffing rating, which was a direct result of White's instruction to Mercado to misrepresent its staffing data.

62.     From Relator Orten's observations and experience, by late 2012 John Sorensen's "value add" approach was now in full effect at NAHC.  The company had made a push to add a network of physicians to the medical boards of its various facilities.  It was widely known and accepted that these doctors were paid far above market value to obtain and refer

Medicare residents to NAHC facilities.  The monies were not being paid for any other legitimate purpose.  Based on his conversation and Sorensen's direction about what amount to pay doctors, Relator Otren estimated that NAHC was spending up to $10,000 a month on physicians who were expected to bring "value adds" i.e. Medicare patients to NAHC facilities.  In addition to the referrals, NAHC requested these doctors to evaluate and send out long-term care patients for new 3-day qualifying acute care hospital stays, so that the patient could regenerate Medicare reimbursement rights and the paid doctors could re-refer them to the same facility with which they had the financial relationship.

63.    NAHC's efforts to regenerate residents' Medicare reimbursement qualifications resulted in a stark statistical shift in the percentage of residents in its facilities whose bills were paid with Federal Medicare funds.  The overall California statewide average for the percentage of days paid Medicare for all nursing homes was 16.4%.  NAHC's averages exceeded that in every facility except three.  It grossly and disproportionately exceeded the overall statewide average for every other facility, having as much as 85.4% (Lake Balboa) and 63.1% (Terrace View Care Center) of its days paid by Medicare for one its facilities; and the great majority of the remaining facilities in the 30-50% range.

64.    On August 9, 2012 Relator Orten had a meeting with Regional Vice President Bryan Tanner.  During the meeting Orten again expressed concern that NAHC corporate was ignoring the obvious signs that Ramona's management was engaging in fraudulent practices.  Orten told Tanner that he felt targeted and retaliated against because he brought the illegal practices at Ramona to light and refused to engage in similar conduct in the past.  Orten pointed out the fact that John Sorensen had not spoken to him since he raised the issue in February 2012.  Tanner informed Orten that Sorensen, "just looks at the bottom line."  After this conversation, when it became clear that NAHC corporate management was steadfast on not

THIRD AMENDED COMPLAINT

changing their ways or halting their illegal and unethical behaviors, Orten began drafting his complaint to OIG, laying out the fraud that he learned was taking place at Ramona.

65.     On October 19, 2012 Relator Orten received an email from Regional VP Bryan Tanner placing him on formal 90-day probation.  Tanner's email informed Orten he could no longer use problems related to the remodel as an "excuse" for his failures, in spite of the remodel still not being completed.  (EXHIBIT 18).  Orten responded in writing to his grant of probation, laying out his rebuttal to NAHC's criticisms.  (Id.)  A few days later a group of mock surveyors from NAHC showed up at Orchard Park and conduct a stunningly severe internal survey of the facility.  The NAHC surveyors were cold and unwelcoming to Orten during the process.  Orten was immediately suspicious of the process and its timing, given he had just challenged his probationary status and had routinely been left unsupported by corporate management since his refusal to engage in bribery and his unmasking of fraud at Ramona.  COO Tim Paulsen required Orten to complete a plan of correction based on the mock survey findings – a virtually unheard of practice in the industry.  The plan of correction was due the day of the NAHC Christmas party, an event that, for the first time during his employment at NAHC John Orten and his wife were not invited to, despite the fact his own director of nurses attended.

66.     On November 23, 2012 John Orten submitted a report to the Office of Inspector General (hereinafter OIG) detailing the fraud occurring at Ramona.  A complete copy of the reported is attached hereto and incorporated herein by reference.  (EXHIBIT 19.)

67.     NAHC and its managing agents continued to take steps to undermine Orten's ability to complete the remodel and make Orchard Park presentable to perspective clients.  On December 19, 2012 furniture was delivered the facility, but delivery personnel told Orten they had been by instructed by NAHC not to unload the items.  When he inquired about setting up the furniture, NAHC managing agents instructed Orten that he would have to wait for the NAHC

designers to install the furniture.  The designers did not come to the facility until nearly a month later - January 17, 2013.

68.     A little over a month after Orten submitted his complaint to OIG and less than 5 months after he reiterated to Regional VP Bryan Tanner that rampant fraud was occurring at Ramona, John Orten was terminated.  On January 17, 2013 John Sorensen, Tim Paulsen, and Bryan Tanner arrived at Orchard Park unannounced.  Orten met in his office with Paulsen and Tanner, as Sorensen waited outside, (continuing his pattern of refusing to speak with Orten since the February 2012 incident when Orten refused to bribe doctors.)  Paulsen and Tanner met with Orten and asked him where he saw his future with the company.  Orten related his thoughts about the work he had done at the community, the cost savings he had created, and the reasonable timeline for turning the facility around given how long it had been mired in the protracted remodel.  Paulsen told Orten, "We are going down the road to separation."  Orten continued to layout the uptrend at the facility and the positive momentum he had generated despite the numerous challenges he faced.  At the conclusion of the conversation Paulsen indicated, "Okay, if things continue trending up we'll reconsider."  As the three men stepped into the lobby where Sorensen was waiting, Sorensen asked the group, "How did it go?"  Orten enthusiastically replied, "We're going to get it done!"  Sorensen looked puzzled and turned to Paulsen and Tanner and asked, "What happened?"  Orten explained to Sorensen in the lobby of Orchard Park everything he had related to Paulsen and Tanner.  Sorensen excused himself and asked to speak privately with Paulsen and Tanner.  A short time later Paulsen and Tanner returned and indicated Sorensen had asked "an employee or two what the morale was like," and they had indicated the morale was low.  They would not answer further questions about with whom or how many people Sorensen had allegedly spoken.  The three NAHC executives then left the facility.

69.     The following evening at 10 pm, January 18, 2013, Bryan Tanner, at the

-29-

direction of John Sorensen sent an email that constructively terminated Orten, requesting his

letter of resignation:

> During our meeting yesterday, Tim, you and I discussed several concerns
> regarding your overall performance since taking over as the administrator at
> Orchard Park. The significant financial losses month after month, inability to
> increase overall census, leadership shortcomings that frustrate and affect the
> morale from several staff, etc. all have contributed to the decision to separate
> in the immediate future. On October 19, 2012 I sent a letter expressing
> concerns and allowing you a 90-day probationary period to demonstrate
> improvement, or at least an improving trend financially. You followed with
> your own letter asking for a longer grace period. However, since that time,
> Orchard Park has had its two most significant financial setbacks in many,
> many years. As such, I would welcome your resignation and am willing to
> continue to pay you as you assist in the transition to another administrator.
> This process could take a couple of weeks. I have arranged to have both Ben
> Pyper and Taylor Florence assist at Orchard Park beginning next Monday.
> They will work as assistant administrators, helping you and Shanda with the
> most pressing issues.

(EXHIBIT 20).  Orten went to Orchard Park the following morning and collected his belongings.

70.    A telephone conversation with Bryan Tanner three days later on January

21, 2013 revealed that the termination had come as a surprise to Tanner as well.  Tanner told

Orten that John Sorensen had "flipped out" while driving back later that afternoon and told him,

"Bryan! You need to draft a letter to [John Orten] now!!! I want it sent out tonight.  I want this

finished."  During the telephone conversation Orten told Tanner he felt NAHC executives had

targeted him ever since he brought up the fraud allegations against Ramona back in February

2012.  Tanner did not respond to this statement.  Orten did not offer his resignation during the

conversation, but did indicate he preferred to be out looking for a job as opposed to sitting

meaninglessly inside the facility during the transition.  Tanner agreed and indicated he would

check with Tim Paulsen regarding a severance for Orten.

71.    On Friday, January 25, 2013 John Orten received an email from Tim

Paulsen and Bryan Tanner instructing him not to return to the facility or have any contact with its

employees, residents, and/or residents' families.  The email lists pretextual reasons for Orten's termination that were virtually all inaccurate and refutable.  Indeed the stated reasons even contradicted prior communication and statements regarding Orten's job performance and NAHC's motivation for his firing.  The email concluded by instructing Orten his "future career in this profession will be influenced significantly by how you handle this transition."  (SEE EXHIBIT 21).  Orten responded to NAHC's allegations by filing a formal grievance with Catherine Stout, a lawyer employed by the company.  (ID.)  Ms. Stout replied on February 5, 2013 and informed Orten that his allegations were not substantiated.

72.     In February 2013, following electronic receipt of Relator Orten's report, OIG investigators assigned to the NAHC false claims investigations contacted Relator Orten and arranged a meeting for April 5, 2013. OIG had been investigating RUG upcoding at NAHC since 2008. At the meeting investigators thanked Relator Orten for his report and indicated that it was helpful, as representatives at NAHC had ceased communication with their agency.  The investigators indicated that the information Relator Orten provided strengthened the pending claims and broadened the allegations they were investigating, allowing them to issue subpoenas for specific information included in Relator Orten's report. OIG officials then had Relator Orten authenticate hard copies of e-mails that he had described in his November 2012 OIG report, including emails authored by John Sorensen which directed Administrators to give illegal kickbacks to doctors.  Relator Orten provided specific additional information about how high-level management within NAHC avoided paper trails and managed the widespread fraud throughout the many facilities it owned and operated.  Moreover, Relator Orten provided recorded conversations with high-level NAHC executives wherein these managing agents were placed on notice of the ongoing fraud in the facilities and adoptively admitted to being aware of such fraud.  Moreover, Relator Orten provided OIG investigators the name and cell phone contact

information for Christine Bak, who was aware of the ongoing kickback and Medicare

regeneration scheme occurring in NAHC buildings and could provide key testimony and evidence

about its operation.  Moreover, Relator Orten provided OIG investigators with the names of

multiple doctors involved in the illegal kickback fraud and regeneration fraud.

## **COUNT ONE**

### **FEDERAL FALSE CLAIMS ACT VIOLATIONS (31 U.S.C. § 3729)**

73.     Relator Orten re-alleges and incorporates each of the allegations of this

Complaint as if fully set forth herein.

74.     Defendants' payment of kickbacks to physicians and other health care

providers violated the Medicaid Anti-Kickback statute, Stark Law, and other statutes and

regulations controlling the payment of governmental employees and military personnel and

caused false claims to be submitted to the federal government.  Since the Medicaid Anti-

Kickback statue is a critical provision of Medicaid, compliance with it is material to the

government's treatment of claims for reimbursement.  Had the United States and the several

states known that NAHC was submitting Medicare reimbursement requests from its facilities for

beneficiaries secured through illegal kickbacks to physicians in acute facilities, the United States

and the several States would not have funded these illegal kickbacks after the fact by providing

reimbursement for these NAHC resident.  As the United States and the States were unaware of

the illegality of the claims, and in reliance on the accuracy and legality thereof, made payment

upon the false or fraudulent claims, the United States and the States were damaged.

75.     Moreover, had the United States and the several states known that NAHC

was engaging in fraudulent conduct to maintain its Medicare.gov 5-star rating, including:

submitting false and misleading staffing data to government surveyors tasked with calculating

facility staffing ratios; and unlawfully bribing and offering kickbacks to doctors to sign pre-

authored NAHC statements challenging the legitimacy of state issued deficiencies, the United States and the several States would not have funded these illegal kickbacks after the fact by providing the same Medicare.gov star-rating.  As the United States and the States were unaware of the illegality of the claims, and in reliance on the accuracy and legality thereof, made payment upon the false or fraudulent claims, the United States and the States were damaged.

76.    The kickbacks described herein are strictly illegal and have had the direct effect of greatly increasing the amount of Medicare reimbursements paid by the government and under the auspices of government programs.  The kickbacks have had the indirect effect of increasing the amount of money spent by the federal government and the states for reimbursement of services covered by Medicaid, Medicare, and TRICARE. The payment of these kickbacks represents the inducement of federal payments through a pattern of fraudulent conduct and constitutes false claims within the meaning of 31 U.S.C. § 3729.

77.    Defendants also violated the False Claims Act through upcoding and unnecessary treatment fraud.  They subjected NAHC residents to treatments that were devoid of value so that they could bill the United States and state governments for treatment and continued to do so even after the Washington post reported that Representative Stark had asked HHS to look into NAHC's practices.  Had the United States and the several states known that NAHC was submitting Medicare reimbursement requests from its facilities for beneficiaries based on unnecessary treatment and upcoding, the United States and the several States would not have provided reimbursement for these NAHC residents.  As the United States and the States were unaware of the illegality of the claims, and in reliance on the accuracy and legality thereof, made payment upon the false or fraudulent claims, the United States and the States were damaged. Defendants' conduct constitutes false claims within the meaning of 31 U.S.C. § 3729.

/ / /

THIRD AMENDED COMPLAINT

## COUNT TWO

### DEFENDANTS' CONDUCT AS CONSPIRACY TO SUBMIT FALSE CLAIMS (31 U.S.C. § 3729(A)(3))

78.     Relator Orten re-alleges and incorporates each of the allegations of this Complaint as if fully set forth herein.

79.     Defendants combined, conspired, and agreed together with physicians and others, including individuals who were not employed by NAHC, including without limitation Janelli Savellano and Dr. Ashok,, to defraud the United States by knowingly causing false and illegal claims to be submitted to the United States for the purpose of having those claims paid and ultimately profiting from those false claims.  Defendants committed other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(3), causing damage to the United States.

### PRAYER FOR RELIEF UNDER FEDERAL FALSE CLAIMS ACT

Relator Orten respectfully requests this Court to enter judgment against Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)     That civil penalties at the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

THIRD AMENDED COMPLAINT

(e)     That the Relator be awarded the maximum percentage of any recovery allowed to them pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(f)     That this Court award such other and further relief as it deems proper.

## COUNT THREE

### VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT (Cal. Gov't Code § 12650 et seq.)

80.     Additionally, Relator Orten states that the course of conduct described in this Complaint was a nationwide practice of North American Health Care, Inc. and John Sorensen.  Because state Medicaid programs operate in conjunction with Medicare, Defendants defrauded California when they defrauded the United States.  For example, after the twentieth day of a stay at a skilled nursing facility covered by Medicare, a patient's co-insurance becomes partially responsible for paying the bill.  For Medi-Cal-qualifying patients, Medi-Cal acts as the co-insurance.  Therefore, when Defendants conducted their fraudulent scheme to regenerate residents' Medicare reimbursement, they also defrauded the state Medi-Cal programs.

81.     This is a qui tam action brought by Relator Orten and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

82.     Cal. Gov't Code § 12651(a) provides liability for any person who—

Knowingly presents, or causes to be presented, to an officer or employee of the state of any political division thereof, a false claim for payment or approval;

Knowingly makes, uses, or causes to be made or used a false record of statement to get a false claim paid or approved by the state or by any political subdivision;

Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state of by any political subdivision.

Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to

disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

83.     In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

84.     North American Health Care, Inc. and John Sorensen violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 from at least 2006 to the present by engaging in the fraudulent and illegal practices described herein.

85.     North American Health Care, Inc. and John Sorensen furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 2006 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act and Stark Act Requirements, as described herein.

86.     The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

87.     Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' fraudulent and illegal practices.

88.     Had the State of California known that North American Health Care, Inc. and John Sorensen were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

89.     As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

90.     Relator John Orten is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of himself and the State of California.

91.     This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

92.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against North American Health Care, Inc. and John Sorensen:

To the STATE OF CALIFORNIA:

Three times the amount of actual damages which the State of California has sustained as a result of Defendants' fraudulent and illegal practices;

A civil penalty of up to $10,000 for each false claim which North American Health Care, Inc. and John Sorensen presented or caused to be presented to the State of California;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

/ / /

/ / /

## COUNT FOUR

**VIOLATION OF THE WASHINGTON FALSE CLAIMS ACT (Washington Revised Code § 74 66-005 et seq.)**

93.     Relator Orten re-alleges and incorporate the allegations in the above paragraphs as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Washington.  Upon information and belief, Defendants' actions described herein occurred in the State of Washington as well.  Because state Medicaid programs operate in conjunction with Medicare, Defendants defrauded California when they defrauded the United States.  For example, after the twentieth day of a stay at a skilled nursing facility covered by Medicare, a patient's co-insurance becomes partially responsible for paying the bill.  For Medicaid-qualifying patients, Medicaid acts as the co-insurance.  Therefore, when Defendants conducted their fraudulent scheme to regenerate residents' Medicare reimbursement, they also defrauded the state Medicaid programs.

94.     This is a qui tam action brought by Relator and the State of Washington to recover treble damages and civil penalties under the Washington False Claims Act, Washington Revised Code § 74 66-005 et seq.

95.     Washington Revised Code § 74 66-020 provides liability for any person who:

> Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> Conspires to commit one or more of the violations in this subsection.

96.     Defendants violated Washington Revised Code § 74 66-020 from at least 2006 to the present by engaging in the fraudulent and illegal practices described herein.

97.     Defendants furthermore violated Washington Revised Code § 74 66-020 and knowingly caused thousands of false claims to be made, used and presented to the State of Washington from at least 2006 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

98.     The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

99.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' fraudulent and illegal practices.

100.    Had the State of Washington known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

101.    As a result of Defendants' violations of Washington Revised Code § 74 66-020 the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

102.    Relator Orten has direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Washington Revised Code § 74 66-050 on behalf of itself and the State of Washington.

103.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

THIRD AMENDED COMPLAINT

104.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

A. To the STATE OF WASHINGTON:

Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' fraudulent and illegal practices;

A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

Prejudgment interest; and

All costs incurred in bringing this action.

B. To RELATOR:

The maximum amount allowed pursuant to Washington Revised Code § 74 66-070 and /or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

**COUNT FIVE**

**RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(h)**

105.     Relator Orten re-alleges and incorporates each and every allegation above as if fully set forth herein.

106.     In terminating Relator Orten's employment and otherwise discriminating against Mr. Orten in the terms and conditions of his employment, because of his efforts to stop the violations of the Federal False Claims Act as described above, NAHC violated the False Claims Act, 31 U.S.C. §§ 3729 et seq.

**COUNT SIX**

**RETALIATION IN VIOLATION OF CAL. LABOR CODE § 1102.5**

107.     Relator Orten re-alleges and incorporates each and every allegation above as if fully set forth herein.

108.     NAHC fired Plaintiff in retaliation for complaining about illegal practices to a government entity and his refusal to participate in the illegal activities described above.  Mr. Orten had a reasonable belief that the above practices violated the False Claims Act, 31 U.S.C. §§ 3729 et seq., the California False Claims Act, Cal. Gov't Code §§ 12605 et seq., the Occupational Health and Safety Act of 1970, and Title 8 California Code of Regulations.

109.     NAHC's retaliatory acts are in direct violation of *Cal. Labor Code* § 1102.5(c), which provides that an employer may not retaliate against an employee for reporting unlawful conduct, threatening to report such conduct, or refusing to participate in such an activity in violation of state or federal statute, or a violation or noncompliance with a state of federal rule or regulation.

110.     Relator Orten refused to participate in what he reasonably believed to be unlawful conduct as set forth above, and he also reported the unlawful conduct to a government agency while he was employed and prior to his termination.

111.     As a direct and proximate result of NAHC's retaliation and wrongful termination, Relator. Orten has suffered and continues to suffer damages that exceed the jurisdictional limit of this Court, including loss of earnings, benefits and severe emotional and physical distress, all of which will be proven at trial.

112.     NAHC committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Relator Orten, from an improper and evil motive amounting to malice, and in willful and conscious disregard of Relator Orten's rights. Defendants acted with malice with the intent of teaching Relator Orten a lesson.  NAHC terminated Relator Orten and thereby deprived Relator Orten of the ability to support himself and his family.  Imposition of punitive damages against NAHC is appropriate and warranted under law because of the malicious and oppressive nature of its acts against Relator Orten that violated public policy and penalized Plaintiff for asserting his rights.  An award of punitive damages against Defendants will also serve to deter NAHC from committing any future wrongdoing.

## COUNT SEVEN

## (WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY)

113.    Relator Orten re-alleges and incorporates the each and every allegation above as if fully set forth herein.

114.    The conduct described in this Complaint, including retaliation, constructive discharge and wrongful termination of Relator Orten, constitutes a violation of public policy embodied in *Cal. Labor Code* § 1102.5, False Claims Act, 31 U.S.C. §§ 3729 et seq., the California False Claims Act, Cal. Gov't Code §§ 12605 et seq., the Occupational Health and Safety Act of 1970, Title 8 California Code of Regulations. and *Bus. and Prof. Code* § 17200.

115.    As a direct and proximate result of NAHC's retaliation and wrongful termination, Relator Orten has suffered and continues to suffer damages that exceed the jurisdictional limit of this Court, including loss of earnings, benefits and severe emotional and physical distress, all of which will be proven at trial.

116.    NAHC committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Relator Orten, from an improper and evil motive amounting to malice, and in willful and conscious disregard of Relator Orten's rights. NAHC acted with malice with the intent of teaching Relator Orten a lesson.  NAHC terminated Relator Orten and thereby deprived Relator Orten of the ability to support himself and his family. Imposition of punitive damages against NAHC is appropriate and warranted under law because of the malicious and oppressive nature of its acts against Relator Orten that violated public policy and penalized Plaintiff for asserting his rights.  An award of punitive damages against NAHC will also serve to deter NAHC from committing any future wrongdoing.

## PRAYER FOR RELIEF UNDER COUNTS FIVE THROUGH SEVEN

(a)    Against NAHC, for money judgment representing compensatory damages including lost wages, earnings, retirement benefits and other employee benefits, and all other sums of money, together with interest on these amounts, according to proof;

1        (b)     Against NAHC, for a money judgment for mental pain and anguish and emotional

2  distress, according to proof;

3        (c)     Against NAHC, for an award of punitive damages for terminating Relator Orten in

4  violation of public policy; per *Tameny v. Atlantic Richfield Co* (1980) 27 Cal.3d 167; and per

5  California Civil Code §3294;

6        (d)     Against NAHC, for prejudgment and post judgment interest;

7        (e)     Against NAHC, for attorneys' fees and costs pursuant to *Cal. Code of Civ. Pro. §*

8  *1021.5* and/ or attorney's fees and costs as are otherwise permissible by law; and

9        For any other relief that this court deems just and proper.

10                    **<u>DEMAND FOR JURY TRIAL</u>**

11        Relator hereby demands a jury trial.

12

Dated:  December 9, 2015         Respectfully submitted,

13

14

15                      By:    <u>/s/ C. Brooks Cutter</u>
                            C. Brooks Cutter

16                            John R. Parker, Jr.
                          CUTTER LAW PC

17                            401 Watt Avenue
                          Sacramento, California 95864

18                            Telephone:    (916) 448-9800
                          Facsimile:    (916) 669-4499

19

20                            ATTORNEYS FOR RELATOR
                          JOHN ORTEN

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT